**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| BBAM Aircraft Management LP | : | Case No. 3:20-cv-1056 (OAW) |
| BBAM US LP | : | |
| *Plaintiffs* | : | |
| | : | |
| *v.* | : | |
| | : | |
| Babcock & Brown LLC | : | |
| Babcock & Brown Securities LLC | : | |
| Burnham Sterling & Company LLC | : | |
| Babcock & Brown Investment | : | |
| Management LLC | : | AUGUST 29, 2022 |
| *Defendants* | | |

## **RULING ON THE PARTIES' MOTIONS TO COMPEL & TO STAY DISCOVERY**

Defendants Burnham Sterling & Company LLC ("Burnham Sterling & Co."), Babcock & Brown LLC ("B&B LLC"), Babcock & Brown Securities LLC ("B&B Securities LLC"), and Babcock & Brown Investment Management LLC ("BBIM") (collectively "Burnham Sterling" or "Defendants") and Plaintiffs BBAM Aircraft Management LP and BBAM US LP (collectively "BBAM" or "Plaintiffs") have filed separate motions to compel. Each side seeks to obtain certain discovery withheld by the other as privileged. Burnham Sterling seeks production of communications between BBAM and its trademark licensee, Nomura Babcock & Brown ("NBB"). BBAM seeks production of communications pertaining to a trademark investigation conducted by Burnham Sterling's attorneys. For the reasons stated herein, Burnham Sterling's motion to compel hereby is **DENIED**, and BBAM's motion to compel hereby is **DENIED in part and GRANTED in part**.

## I.    BACKGROUND

This is a trademark infringement action concerning the use of the "BABCOCK & BROWN" and "B&B" trademarks in the aircraft financing industry.  BBAM operates a large-scale commercial aircraft leasing company.  BBAM maintains that its predecessor, Babcock & Brown LP, granted BBAM an exclusive license to use the "BABCOCK & BROWN" mark in the aviation field, which BBAM continuously has used for more than thirty years.  Am. Compl. at ¶ 18, ECF No. 32.  BBAM further alleges that a former executive of Babcock and Brown LP, Michael Dickey Morgan ("Mr. Morgan"), has used the "BABCOCK & BROWN" mark, as well as the abbreviated "B&B" mark, through his various entities, including some of BBAM's direct competitors:  Burnham Sterling & Co., "B&B LLC", B&B Securities LLC, and BBIM.  *Id.* at ¶¶ 29–44.  Specifically, BBAM alleges Defendants have used BBAM's marks in connection with goods and services in the aircraft leasing and asset management industries*. Id.* at ¶ 29.   BBAM's ten-count complaint includes claims of trademark infringement, false designation of origin, false advertising, and unfair competition.  *Id.* at ¶¶ 48–118.  BBAM seeks to cancel the trademarks issued to B&B LLC for the following word marks: "B & B", "B&B", and "BABCOCK & BROWN".  Lastly, BBAM requests an order refusing Burnham Sterling & Co.'s pending trademark application for the "BURNHAM BABCOCK & BROWN" word mark.  Burnham Sterling maintains that BBAM has abandoned its use of the marks.

## II.    DEFENDANTS' MOTION TO COMPEL

Defendants seek to compel Plaintiffs to disclose certain communications between BBAM and its trademark licensee, NBB.  Defs. Mot. to Compel, ECF No. 93.  NBB is a Japanese investment firm focusing on international aircraft leasing.  NBB was formed

more than 35 years ago as a joint venture between The Nomura Securities Co. and Babcock & Brown Inc. ("BBI").  Defs. Mem. of Law, ECF No. 94 at 6.  In 1998, NBB and Babcock & Brown Inc. ("BBI") entered into a Joint Marketing Agreement (the "JMA") in which both parties agreed to jointly market and provide aircraft leasing investment services to airlines and investors around the world.  JMA, ECF No. 93-16 at 2; Decl. of Vincent Cannon, ECF No. 107-7 at ¶ 2 (hereinafter "Cannon Decl.").  The JMA includes a provision on the use of names and trademarks. JMA, ECF No. 93-16 at 20.  Under this provision, NBB is permitted to use the names "Babcock & Brown," "B&B," or any of the trademarks, trade names or logos of BBI.  *Id.*  The JMA also permits NBB to continue using "Babcock & Brown" as part of its legal name.  *Id.*  The JMA was later assigned to BBAM as the successor of BBI.  Cannon Decl. at ¶ 3.

During the discovery phase of this action, Defendants sent the following discovery requests to obtain certain communications between BBAM and NBB:

**Interrogatory No. 15.** Describe all communications by and among either or both Plaintiffs and any subsidiary of Nomura Holdings, Inc., concerning any Defendant, and identify by Bates number all written communications related to the same.

**Request for Production No. 30.** All documents, correspondence and communications to or from Nomura Babcock & Brown, or any individual affiliated with Nomura Babcock & Brown, regarding this lawsuit or the claims raised in this lawsuit.

Although BBAM has identified certain communication with NBB that is responsive to Burnham Sterling's requests, BBAM has refused to produce them on the grounds that the material is privileged.[1]  Specifically, BBAM maintains that the information sought by

---

[1] The communication identified by BBAM as privileged, and targeted by Burnham Sterling through its motion to compel are labeled with the following Bates stamps: BBAM-PRIV00484 – BBAM-PRIV00502.

Burnham Sterling involves email exchanges consisting of attorney-client communications and attorney work product.

On February 21, 2020, NBB's manager, Chiaki Ueda ("Ms. Ueda"), contacted Akira Komichi ("Mr. Komichi"), a senior vice president at BBAM, to inquire about a recent trademark registration for the "BABCOCK & BROWN" mark in Japan.  Chiaki Ueda Declaration, ECF No. 107-8 at ¶ 4 (hereinafter "Ueda Decl.").  Ms. Ueda states that her exchange with Mr. Komichi "made clear that NBB and BBAM had a common interest in seeking legal advice regarding the registration" as "both NBB and BBAM have a common interest in the ability to use the BABCOCK & BROWN mark[.]"  *Id.* at ¶ 5.  Each of the emails designated by BBAM in its privilege log "contains NBB's and BBAM's discussion of [the] shared legal strategy aimed at protecting NBB and BBAM's rights to use the BABCOCK & BROWN mark[.]"  *Id.* at ¶ 8.  For example, in an email dated February 27, 2020, Mr. Komichi shared advice received from BBAM's U.S. trademark attorneys regarding trademark rights in the BABCOCK & BROWN mark, and subsequent emails discussed the advice and recommendations.  *Id.* at ¶ 10.  Another email exchange dated April 14, 2020 involved Mr. Komichi relaying advice received from BBAM's attorneys at Orrick Herrington & Sutcliffe LLP regarding protecting NBB and BBAM's trademark rights in Japan.  *Id.*

Burnham Sterling maintains that no common interest privilege exists between NBB and BBAM, and that BBAM has waived its attorney-client privilege by sharing the legal advice it received with NBB (a third party).  Burnham Sterling also states that any attorney work product contained within the email exchange is subject to disclosure because

4

Burnham Sterling has a substantial need for the materials, which is sufficient to overcome any protection afforded under the work product doctrine.

a. Common Interest

The common interest rule, also referred to as the "common interest privilege," is an extension of the attorney-client privilege.  *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989).  The doctrine serves as "an exception to the general rule that voluntary disclosure of confidential, privileged material to a third-party waives any applicable privilege."  *Sokol v. Wyeth, Inc.*, 2008 U.S. Dist. LEXIS 60976, at *15 (S.D.N.Y. Aug. 4, 2008).  The common interest rule protects "the confidentiality of communications passing from one party to the attorney for another party where a joint defense[,] effort[,] or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer*, 892 at 243.  Thus, the protection afforded by the attorney-client privilege is "not waived by disclosure of communications to a party that is engaged in a 'common legal enterprise' with the holder of the privilege."  *Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) (citing *Schwimmer*, 892 F.2d 237).  The doctrine preserves "[t]he need to protect the free flow of information from client to attorney logically exists whenever multiple clients share a common interest about a legal matter."  *Schaeffler*, 806 F.3d at 40.

A common legal enterprise may be proven by showing "some agreement, whether formal or informal, written or unwritten, to pursue a joint legal defense."  *Denney v. Jenkins & Gilchrist*, 362 F. Supp. 2d 407, 415 (S.D.N.Y. 2004).  Another method is to submit "affidavits from the attorneys and lay representatives of both [the] parties which show that at a specific time . . . a joint defense or strategy has been decided upon and undertaken by the parties and their counsel."  *Jansson v. Stamford Health, Inc.*, 312 F. Supp. 3d 289,

304 (D. Conn. 2018).  The party invoking the protection of the common interest rule bears the burden of proving the existence of a common legal enterprise, or joint legal strategy. *Go Med. Indus. Pty., Ltd. v. C. R. Bard, Inc.*, Docket No. 3:95 MC 522 (DJS), 1998 U.S. Dist. LEXIS 22919, at *8 (D. Conn. Aug. 14, 1998).  As stated in *Hybrid Athletics*, the party claiming the common interest doctrine must "establish the existence of an ongoing common enterprise, the existence of communications made in the course of that enterprise, and that those communications were made to further the enterprise."  *Hybrid Ath., LLC v. Hylete, Inc.*, No. 3:17-cv-1767 (VAB), 2019 U.S. Dist. LEXIS 204724, at *31 (D. Conn. Nov. 26, 2019).

The common interest rule may be used to protect the confidentiality of communications between two parties in ongoing litigation, or between a party and a non-party to the action.  *See Schaeffler*, 806 F.3d at 40 ("Parties may share a 'common legal interest' even if they are not parties in ongoing litigation.").  The determination rests not on party status, but, instead, whether there exists a "common legal enterprise" between individuals who communicate information that is typically protected under the attorney-client privilege.  *See id.*  In the absence of a joint defense or identical legal interests, the parties may not use the common-interest privilege to shield documents subject to disclosure merely because they have similar commercial interests in the outcome of the litigation.  *Gucci America, Inc. v. Jennifer Gucci*, 2008 U.S. Dist. LEXIS 101760 (S.D.N.Y. 2008); *see also Citibank, N.A. v. Bombshell Taxi LLC (Hypnotic Taxi LLC)*, 566 B.R. 305, 315 (Bankr. E.D.N.Y. 2017) (holding that the legal interest must be "identical, not merely similar").

While the common interest doctrine precludes waiver of the attorney client privilege in communications shared from one party to the attorney of another party, it also protects communications between the parties themselves, even if no attorney is involved therein. "For example, if an attorney provides legal advice to a client – recommending that a defendant move for summary judgment, say – the client can repeat that advice to a codefendant outside the presence of any attorney without causing the privilege to be waived." *Gucci*, 2008 U.S. Dist. LEXIS 101760.

Even if the parties demonstrate that they have a joint legal strategy or legal interest, the communication at issue also must meet the general requirements of privileged material. Thus, a party claiming the common interest doctrine also must show that the communication in question was made in confidence, and that it involves attorney advice. *Schwimmer*, 892 F.2d at 244; *see also United States v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) ("[W]hat is vital to the privilege is that the communication be made in *confidence* for the purpose of obtaining *legal* advice *from the lawyer*.").

BBAM argues that it maintains a common interest with NBB in protecting their joint use of the "BABCOCK & BROWN" mark such that any privileged communication shared between the two parties does not constitute a waiver of that privilege. Burnham Sterling argues that while NBB may have a commercial interest in the outcome of this case, it does not have an identical *legal* interest with BBAM for the purposes of the common interest doctrine.

The court finds that BBAM and NBB have a common legal enterprise in protecting the use of the "BABCOCK & BROWN" mark both in the instant litigation, and more generally. Each of them is a party to the JMA which allows NBB continued use of the

"BABCOCK & BROWN" mark in its business, which it has used since its inception in 1986. *See* Cannon Dec., ECF No. 107-7 at ¶ 2.   NBB not only has a commercial interest in maintaining continued use of the mark, but it has a legal interest in ensuring that its trademark licensing arrangement with BBAM remains unharmed from threats to the mark itself – including, for instance, the likelihood of confusion that may arises from infringing uses.   Moreover, any alleged claims of abandonment – which Burnham Sterling asserts – may threaten the validity of NBB's licensing agreement with a licensor who may not have authority to license the mark.   Therefore, contrary to Burnham Sterling's argument, NBB's common interest with BBAM is not merely a commercial interest, but also a legal interest.   The court agrees that NBB has a financial interest in this case; however "[a] financial interest of a party, no matter how large, does not preclude a court from finding a legal interest shared with another party where the legal aspects materially affect the financial interests."   *Schaffler*, 806 F.3d at 42.   Stated simply, the relationship between a trademark licensor and its licensee necessitates a common interest in the protection of the mark from infringing uses such that sharing attorney advice does not result in the waiver of privilege.

Burnham Sterling argues that the common interest rule is inapplicable because BBAM owes no duty to defend the mark under the JMA.   However, the common interest doctrine developed in this circuit does not require that the party seeking protection owe a legal duty to those with whom it claims to share an interest.   Instead, courts must evaluate whether the alleged common interest "is of a sufficient legal character" to prevent a waiver of privilege.   *Id.* at 41.   For example, in *Hybrid Athletics*, the court found a sufficient legal interest between a plaintiff and the nonparty trademark licensee because the licensee

"derives value from [the licensor] and its marks." *Hybrid Ath., LLC v. Hylete, Inc.*, 2019 U.S. Dist. LEXIS 204724 at *31.  The court finds *Hybrid Athletics* particularly instructive as that case also concerns the applicability of the common interest rule in protecting communications between a trademark licensor and its licensee.  In *Hybrid Athletics*, the plaintiff and its trademark licensee entered into a joint defense agreement after discovering the defendant's alleged infringement of the mark.  "In light of the evidence demonstrating the existence of a joint defense agreement and the evidence of . . . [an] established business relationship and common interest," the court applied the common interest rule to prevent disclosure of email communications involving privileged information.

BBAM and NBB have a long-standing business relationship arising directly from the use of the "BABCOCK & BROWN" mark at issue in this litigation.  There is no doubt that NBB has an interest in protecting the mark from infringing uses.  Moreover, both NBB and BBAM employees have submitted affidavits demonstrating the existence of a joint agreement to combat Burnham Sterling's alleged infringement.  Ueda Decl., ECF No. 107-8 at ¶ 5; Cannon Decl., ECF No. 107-7 at ¶ 7.  Specifically, BBAM and NBB sought to develop a "common legal strategy" with respect to the registration of the "BABCOCK & BROWN" mark in Japan and similar registrations in the United States.  *Id.*  Moreover, the emails contain attorney advice from BBAM's in-house counsel to NBB's in house counsel. *Id.* at ¶ 12.  The advice concerns discussion as to the legal strategy on how to protect the "BABCOCK & BROWN" mark. *Id.*  The court finds that the emails identified on BBAM's privilege log contain confidential attorney-client communications that are protected from disclosure under the common interest rule.

9

Although Burnham Sterling seeks an in-camera review of the emails to determine whether they can be produced in redacted form, the court declines to exercise such a review.  *See Local 3, Int'l Bd. of Elec. Workers v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988) ("In camera review is considered the exception, not the rule, and the propriety of such review is a matter entrusted to the district court's discretion.").  "As other courts have held, given the burdens associated with *in camera* review, a court should not indulge a party's invitation to conduct one unless that party has made some minimal showing that review is likely to support its position."  *Micillo v. Liddle & Robinson LLP*, No. 15-CV-6141 (JMF), 2016 U.S. Dist. LEXIS 67247, at *22 (S.D.N.Y. May 23, 2016).

A review of the privilege log, as well as the descriptions of the email exchange contained in BBAM's affidavits, assures the court that the material discussed involves privileged information.  Although Burnham Sterling characterizes the email exchange as a "mere discussion of the potential of the present litigation," the affidavit from BBAM's in house counsel, Vincent Cannon ("Mr. Cannon"), describes the emails as containing "a summary" of legal advice and recommendations on how to protect BBAM's trademark. Cannon. Decl., ECF No. 107-7 at ¶ 12.  Indeed, the affidavit explains that the emails sent from Mr. Komichi at BBAM to Ms. Ueda at NBB contains excerpts directly copied and pasted from Mr. Cannon's legal analysis on how to deal with the trademark threats.  *Id.* Moreover, the privilege log indicates that numerous emails were sent directly to NBB's in house legal team.  Mr. Cannon's legal analysis was forwarded by NBB to NBB's own Japanese attorneys.  Hiroyuki Tanaka Decl., ECF No. 107-9 at ¶ 5.  The court has no reason to doubt the veracity of affidavits submitted by Mr. Cannon, Ms. Ueda, or Mr.

Tanaka (NBB's outside counsel).  *See Donovan v. F.B.I.*, 806 F.2d 55, 59 (2d Cir. 1986) (*in camera* inspection unnecessary if affidavits are sufficiently detailed).

   b.  <u>Attorney Work Product</u>

In the alternative, even if the common interest rule did not apply, the emails at issue have an independent basis for protection under the work product doctrine.  Under Rule 26(b)(3)(A), "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative[.]"  The "core" of the work product doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."  *In re Steinhardt Partners*, 9 F.3d 230, 234 (2d Cir. 1993).  BBAM argues that the emails sought by Burnham Sterling reveal the mental impression and litigation strategies of BBAM's counsel.  Burnham Sterling, however, contests the applicability of the work product doctrine because Plaintiffs have not shown "that all of the subject communications reveal mental impressions, conclusions, opinions or legal theories."  The court disagrees.  BBAM has provided detailed affidavits describing the contents of the emails withheld in the privilege log as BBAM-PRIV00486–BBAM-PRIV00502.  "Each of the emails in the thread consists of a communication in which BBAM and NBB (1) engage in discussions for the purpose of seeking legal advice regarding third-party registrations of the BABCOCK & BROWN marks; (2) convey legal advice received from one of the parties' attorneys . . . and/or (3) discuss implementing legal advice received from one of the parties' attorneys . . . ."  Ueda Decl., ECF No. 107-8 at ¶ 9.  Moreover, each email includes discussion of the shared legal strategy developed by BBAM's in-house counsel.  Cannon Decl., ECF No. 107-7 at ¶ 11.  To the extent that the emails identified by Burnham

Sterling contain mere discussion about the legal advice received from BBAM or NBB attorneys, such discussion also is protected under the work product doctrine.  Email discussions as to the substance of an attorney's work product, such as the attorney's mental impressions regarding legal strategy or the strength of the claims at issue, is confidential information to which adversaries are not entitled.  *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 78 (2d Cir. 2010) (holding that emails regarding a PowerPoint presentation prepared by in-house counsel properly are withheld as work product).

Of course, the protections afforded under the work product doctrine may be overcome upon a showing that a party "has a substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A)(ii).  Burnham Sterling argues that it has a substantial need for the documents so that it can determine why BBAM altered its website to include the "BABCOCK & BROWN" and "B&B" marks.  Burnham Sterling suspects that BBAM added the references solely for the purpose of demonstrating use of the marks in commerce for this litigation.  However, depositions have concluded, and Defendants are unable to ascertain BBAM's motivation behind the website references from other documents or discovery methods.  The court finds that Burnham Sterling has not demonstrated a substantial need to discover the protected emails.  The contents of the email exchange at issue do not discuss changes to the BBAM website.  Cannon Decl., ECF No. 107-7 at ¶¶ 11–14.  Instead, Burnham Sterling seeks discovery of the emails because they were sent "at the same time" as other emails already produced which do, in fact, discuss BBAM's website changes.  Defs. Reply, ECF No. 121 at 6.  The court is not inclined to erode the protections of the work product protection on an assumption that

the emails may contain information as to BBAM's website – particularly when BBAM has submitted affidavits assuring that the emails contain no such discussion relevant to the website.   Burnham Sterling has not articulated any other reason demonstrating a substantial need for discovery of emails containing attorney work product.  Accordingly, the motion to compel hereby is **<u>DENIED</u>**.


## III.   PLAINTIFFS' MOTION TO COMPEL

BBAM seeks to compel discovery related to Burnham Sterling's trademark investigations conducted prior to registering to its "BABCOCK & BROWN" and "B&B" marks at issue.  Pl. Mot. to Compel, ECF No. 98.   Specifically, BBAM seeks an order compelling the following discovery:

- Documents reflecting attorney advice provided to Burnham Sterling on whether the marks at issue were available for Defendants' use, the risks of rebranding with such marks, and the use of the marks by BBAM or its licensees;

- Documents pertaining to Burnham Sterling's knowledge of facts regarding the use of the marks, or any prior trademark investigation;

- A search of Burnham Sterling's documents not already produced to BBAM which contains information related to both of the above topics;

- A further deposition of Mr. Michael Dickey Morgan ("Mr. Morgan") (former BBAM employee and Defendants' Executive Managing Director) where he addresses certain topics pertaining to Burnham Sterling's prior trademark investigation.

The specific documents sought by BBAM have been withheld as privileged by Burnham Sterling.  The documents are identified in Exhibit 1 to BBAM's motion to compel.  Ex. 1, ECF No. 100-1 at 11.  BBAM also requests an *in camera* review of the documents

to the extent that they contain nonprivileged factual information that are responsive to BBAM's discovery requests.  *See* Ex. 1, ECF No. 100-1 at 11.  The court will address each of the requests seriatim:

a. <u>Attorney Communications on Trademark Investigations</u>

In 2015, Mr. Morgan and his attorney, Pat Shriver ("Attorney Shriver") of Fafinski Mark & Johnson, P.A ("Fafinski"), retained a third-party trademark investigator to determine whether the "BABCOCK & BROWN" mark was in use at that time.  The trademark investigator, known as Marksmen, issued a report dated October 9, 2015.  In the report, Marksmen determined that the "BABCOCK & BROWN" mark "is no longer being used by business entities in the U.S."  Ex. 6, ECF No. 100-1 at 28.  Burnham Sterling has produced the report to BBAM as part of their discovery production in this action.  Ex. 6, ECF No. 100-1 at 26.

In addition to the Marksmen report, Burnham Sterling also has produced two privileged emails from Attorney Shriver to Mr. Morgan.  The first of these emails, dated October 29, 2015, consists of Attorney Shriver's advice on the "Do's and Don'ts" of rebranding a company with a prior company's trade name.  Ex. 7, ECF No. 100-1 at 39.  Burnham Sterling admits that it has waived any attorney-client privilege with respect to the "Do's and Don'ts" email because Mr. Morgan forwarded Attorney Shriver's advice to a third party.  Defs. Opp., ECF No. 114 at 11.  The second email, dated October 11, 2015, contains Attorney Shriver's summary of the Marksmen report.  Ex. 13, ECF No. 100-1 at 64.

BBAM contends that Burnham Sterling's voluntary disclosure of the two attorney-client emails results in a privilege waiver of all additional attorney-client communications concerning the same subject matter.  Where a party has waived its privilege over

protected information, the scope of the waiver—including its limitations—is governed under Rule 502 of the Federal Rules of Evidence.  Rule 502(a) specifies that the attorney-client privilege is waived as to undisclosed communications only if "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together."  Fed. R. Evid. 502(a).  Here, Burnham Sterling admits that it intentionally disclosed Attorney Shriver's emails by voluntarily producing them to BBAM during the course of discovery. Defs. Opp., ECF No. 114 at 5–7.  Thus, the only issues are whether the undisclosed communications sought by BBAM concern the same subject matter as Attorney Shriver's emails, and whether fairness requires the consideration of additional emails.

Attorney Shriver's October 11 email discusses the results of the Marksmen Report and concludes that the "BABCOCK & BROWN" name "should be available" for Mr. Morgan's use.  The "Do's and Don'ts" email on October 29 relays attorney advice on how to rebrand Mr. Morgan's companies with the mark.  The communications sought by BBAM include additional emails from Fafinski attorneys discussing the "U.S. trademark use investigation."  Ex. 1, ECF No. 100-1 at 11.  Burnham Sterling has produced redacted versions of emails listed on its privilege log which "refer to the trademark search results / use of which Defendants were aware in 2015-16."  Ex. 14, ECF No. 100-1 at 71.  Thus, Burnham Sterling is withholding additional communications referencing the Marksmen report, as well as more generally on the use and availability of the Babcock & Brown mark.

Attorney Shriver's emails undoubtedly concern the results of the Marksmen report (given the summary email on October 11), and the general use and availability of the "BABCOCK & BROWN" mark (given the Do's and Don'ts email).  The court finds that the

disclosed and undisclosed communications concern the same subject matter for purposes of Rule 502.   However, the court will not expand the scope of Burnham Sterling's privilege waiver beyond the information already disclosed, as fairness does not require consideration of additional, privileged communications.

BBAM claims that fundamental fairness requires consideration of all attorney-client communications on Mr. Morgan's use of the mark, and not just selective emails which happen to be favorable to Burnham Sterling's case.   Indeed, the Second Circuit has held that "the attorney-client privilege cannot at once be used as a shield and a sword."   *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991).   "A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes."   In this case, however, Burnham Sterling has not selectively produced certain communications for self-serving purposes.   The "Do's and Don'ts" email was produced because Mr. Morgan had forwarded it to a third party, thereby relinquishing the attorney-client privilege.   Burnham Sterling, recognizing the third-party disclosure, produced the email as a document responsive to BBAM's discovery requests.   The court has no evidence that Burnham Sterling produced the "Do's and Don'ts" email for any reason other than adhering to candid discovery practices.   Burnham Sterling's production of the October 11 email was intended purely as a compromise to BBAM's demands of providing additional privileged information, with the understanding that it would not relinquish privilege with respect to other communications.   Ex. 9, ECF No. 100-1 at 47.   Thus, the court finds that Burnham Sterling has not selectively disclosed privileged information for its own benefit.

BBAM contends that without additional discovery into the remaining attorney-client communications, it will be prejudiced in rebutting Burnham Sterling's good-faith infringer defense which relies on the advice of counsel. In support of its position, BBAM cites *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P.*, 210 F.R.D. 673, 678 (D. Minn. 2002). In that case, the defendants "received an opinion from counsel that their adoption, and use, of the name 'Minnesota Wild' would be 'entirely lawful.'" The defendants maintained that the legal opinion formed the basis for their advice-of-counsel defense. *Minnesota Specialty Crops, Inc. v. Minnesota Wild Hockey Club, L.P.*, 210 F.R.D. 673, 678 (D. Minn. 2002). In considering fairness to the parties, the court found that the proper scope of the waiver extends to the full extent of the advice-of-counsel defense. *Id.* For example, disclosure is necessary where "Defendants received a second opinion, from the same, or different legal counsel, which advised of their view that Defendants were guilty of infringement." *Id.*

While *Minnesota Specialty Crops* is not authority binding on this court, it remains distinguishable in that Burnham Sterling is not in this case relying on an advice-of-counsel defense against BBAM's trademark infringement claims. In its answer, Burnham Sterling asserts an affirmative defense of "Innocent Infringement," yet it does not specify whether the basis for the good faith defense is based on attorney advice. Answer, ECF No. 95 at ¶ 127 (Eighth Defense). In its brief, and in numerous emails to BBAM, Burnham Sterling emphatically has stated that it is not relying on the advice of counsel for its good-faith defense. Defs. Opp., ECF No. 114 at 15; Ex. 9, ECF No. 100-1, at 47. In fact, Burnham Sterling even offered BBAM a draft stipulation stating that Defendants "are not relying on any advice or opinions of counsel in defending against Plaintiffs' assertion of willful

17

infringement."  Ex. 24, ECF No. 100-1 at 183.  Instead, Burnham Sterling maintains that "Defendants intend to rely merely on the fact that they coordinated with counsel to order [the Marksmen] Report and on the fact that they reviewed and considered the findings communicated in the Report itself."  Defs. Opp., ECF No. 114 at 15.

The court has no evidence that Burnham Sterling intends to rely on Attorney Shriver's emails for anything other than the fact that Mr. Morgan contacted Attorney Shriver to commission the trademark investigation.  BBAM merely speculates that "[b]ecause [Mr.] Morgan received the report along with attorney advice, his analysis and interpretation of that report is necessarily informed by that advice."  Pls. Reply, ECF No. 127 at p. 9.  However, at Mr. Morgan's deposition, there was no indication that he relied on attorney advice.  Instead, he stated that he viewed the Marksmen report as a "green light" to use the mark.  Ex. 21, ECF No. 100-1 at 162.

At least one other court in this circuit has recognized that while "a defendant's reliance on a trademark search and advice of counsel are related, they are distinct bases for a finding of good faith."  *J.T. Colby & Co. v. Apple Inc.*, 2013 U.S. Dist. LEXIS 65959, at *79 (S.D.N.Y. May 8, 2013), *aff'd*, 586 Fed. Appx. 8 (2d Cir. 2014) (holding that a defendant is not barred from offering evidence of a trademark search as support for a good-faith defense, even if the defendant shields certain attorney-client communications about the search).  The Second Circuit has recognized that a good faith defense to a claim of trademark infringement "can be found if a defendant has selected a mark which reflects the product's characteristics, has requested a trademark search *or* has relied on the advice of counsel."  *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 575 (2d Cir. 1993).  BBAM conflates Mr. Morgan's reliance on the results of the Marksmen report with

the advice provided by his attorneys. Even if Mr. Morgan did rely on attorney advice when rebranding his companies with the "BABCOCK & BROWN" mark, Defendants are entitled the choice of shielding those communications from disclosure by foregoing the advice-of-counsel defense, which they have done.

Moreover, there is no prejudice to BBAM in rebutting Burnham Sterling's current good faith defense. Burnham Sterling has produced the Marksmen report, and nothing prevents BBAM from attacking the report itself. To the extent that Burnham Sterling seeks to defend the report based on attorney advice or opinion, such reliance will put the attorney advice at issue, and necessitate disclosure of heretofore undisclosed attorney communications. Indeed, BBAM is entitled to move for production of attorney advice if Burnham Sterling raises an advice-of-counsel defense in the future. However, because Defendants have not yet raised such a defense, the court will not expand the scope of the waiver beyond the information already disclosed. Accordingly, BBAM's motion to compel undisclosed privileged communications on the use of the "BABCOCK & BROWN" mark is **DENIED** without prejudice.

b. Factual Information as to the Results of Trademark Investigations

BBAM argues that even if Burnham Sterling is not required to produce the additional attorney communications—which the court will not order—Defendants still must be ordered to produce documents containing non-privileged factual information regarding trademark searches and Defendants' knowledge of trademark use by third parties. Pls. Mem. of Law, ECF No. 100 at 28. Burnham Sterling argues that it already has produced the results of the relevant trademark investigation (i.e. the Marksmen report), and that any additional information would be duplicative. Defs. Opp., ECF No. 114 at 15–17.

As an initial matter, the court holds that any factual information with respect to a trademark investigation, or a defendant's knowledge on the use of a trademark, is not privileged.   The attorney-client privilege extends "only to communications and not to facts." *Upjohn Co. v. U.S.*, 449 U.S. 383, 395–96 (1981).   A party "may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney." *Id.*   Trademark searches routinely have been recognized as non-privileged information. *See e.g., J.T. Colby & Co, Inc. v. Apple Inc.*, 2013 WL 1903883, at *24 ("A defendant does not waive its attorney[-]client privilege by . . . describing its investigation of the search results."); *Adidas Am., Inc. v. TRB Acquisitions LLC*, No. 3:15-CV-2113-SI, 2018 WL 4849312, at *5 (D. Or. Oct. 5, 2018) ("a factual statement . . . reflecting what the trademark searches revealed does not reveal a privileged communication"); *Cue, Inc. v. Gen. Motors LLC*, No. CV 13-12647-IT, 2015 WL 4750844, at *7 (D. Mass. Aug. 10, 2015) (providing the factual results of a trademark search communicated in an attorney email does not waive any privilege).

BBAM requests an *in camera* review of privileged information to determine whether the factual results of Burnham Sterling's trademark investigation can be revealed through redactions.   Burnham Sterling does not object to an *in camera* review, but maintains that BBAM has not provided any justification for performing one.   Defs. Opp., ECF No. 114 at 17.   To the contrary, BBAM has presented evidence that Burnham Sterling previously has withheld non-privileged information as privileged.   For example, Burnham Sterling withheld an email in which Mr. Morgan asks Attorney Shriver for copies of documents (which easily could have been redacted to exclude any privileged information), and an email simply requesting an invoice. *See* Ex. 11, ECF No. 100-1 at 59, 61, 206.   Although

the court will not expand the scope of Burnham Sterling's privilege waiver, it will review the documents listed in Exhibit 1 to ensure that further non-privileged factual information has not been withheld.  *See* Ex. 1, ECF No 100-1 at 11.

The parties further disagree as to whether Burnham Sterling's foreign trademark investigations are relevant to this action.  BBAM maintains that the use of the mark by its foreign licensees and by itself is sufficient to constitute "use in commerce" under the Lanham Act, which provides that "[t]he term 'use in commerce' means the bona fide use of a mark . . . when it is used or displayed in the sale or advertising of services . . . rendered in commerce . . . in the United States *and a foreign country*."  15 U.S.C. § 1127. Burnham Sterling, however, maintains that its good faith defense is premised on its knowledge of BBAM's use (or lack of use) of the mark in the United States. Given the definition within the Lanham Act itself, the court finds that Burnham Sterling's knowledge of foreign trademark use is relevant to the issues in this case. *See ITC Ltd. v. Punchgini, Inc.*, 373 F. Supp. 2d 275, 279 n.6 (S.D.N.Y. 2005), *aff'd in part*, 482 F.3d 135 (2d Cir. 2007) (recognizing the potential to rebut a claim of abandonment by demonstrating "use in commerce" where a plaintiff uses a mark exclusively abroad but advertises domestically to induce patronage of foreign business).

Moreover, in its opposition brief, Burnham Sterling claims that the licensing agreement between BBAM and NBB "is not a matter of public knowledge," and that "Defendants had no reason to attribute such third party's use" to BBAM.  This argument assumes that Burnham Sterling's knowledge of foreign use of the marks is at least somewhat relevant to the good faith defense.  The court's *in camera* review therefore will determine whether the documents sought by BBAM in Exhibit 1 of its motion to compel

contain factual information on Defendants' knowledge of both the foreign and domestic use of the "BABCOCK & BROWN" mark, as well as factual information pertaining to the foreign and U.S. trademark investigations.

The court will review the documents *in camera*, and to the extent that they contain non-privileged factual information pertaining to Defendants' trademark investigations, the court will order Defendants to either disclose the document in full or to redact as necessary.  Where the facts are inextricably tied to attorney advice, the court will mark the document as privileged, and will prevent disclosure.  Burnham Sterling must submit the documents (in physical copy) to chambers within ten (10) days of this ruling, and each document must contain the same Bates stamp identifier as those listed by BBAM in Exhibit 1 to its Motion to Compel.  *See* Ex. 1, ECF No. 100-1 at 11–13.

c.  Further Discovery of Non-Privileged Documents

BBAM seeks an order directing Burnham Sterling to search for and to produce any additional responsive documents that Defendants have not already listed on their privilege logs.  BBAM primarily points to the testimony of Mr. Morgan's former trademark prosecution counsel, Daniel Schloss ("Attorney Schloss") of Greenberg Taurig.  In 2015, Defendants coordinated with Attorney Schloss to file applications for the "BABCOCK & BROWN" mark.  In connection with this action, Burnham Sterling has produced a privilege log of Mr. Morgan's communications with Greenberg Taurig from 2015-16.  BBAM claims that the privilege log is incomplete because Attorney Schloss's deposition reveals that Greenberg Taurig actually began investigating the "BABCOCK & BROWN" mark prior to 2015.

The court will not order Burnham Sterling to conduct another search for responsive discovery material, as there is no evidence that additional non-privileged documents exist.

22

Mr. Schloss testified at his deposition that the first investigation into the "BABCOCK & BROWN" mark was between 2009 and 2015, but he could not recall the exact time period of his investigation.  Schloss Dep., Ex. 18, ECF No. 100-1 at 56:8–58:19.  In fact, Attorney Schloss stated, "I have no idea when the first search was."  *Id.* at 58:15–19.  BBAM relies on mere speculation that if Attorney Schloss conducted trademark investigations prior to 2015, there must exist documents and communications regarding the investigation.  The court has no reason to make the same assumption, particularly when Burnham Sterling has represented that, in preparation of its response to this motion, that it has reviewed whether additional documents exist beyond the 2015-16 period, and only one such document has been found.  McFarland Decl., EC No. 114-1 at ¶ 15.  That document has been produced.  *Id.*  Accordingly, BBAM's motion to compel an additional search of non-privileged records with Greenberg Taurig hereby is denied.

    d.  <u>Additional Deposition of Mr. Morgan</u>

        Finally, BBAM requests a supplemental Rule 30(b)(6) deposition of Mr. Morgan, for which Burnham Sterling already has agreed.  The parties disagree as to the scope of the testimony to be given.  At Mr. Morgan's initial deposition in July 2021, BBAM sought to question Mr. Morgan on Attorney Shriver's advice regarding the use of the "BABCOCK & BROWN" mark.  Burnham Sterling objected to the questions because they sought privileged information and instructed Mr. Morgan not to answer.

        In the absence of an objection from Burnham Sterling, the court will grant a 90-minute supplemental Rule 30(b)(6) deposition of Mr. Morgan.  The deposition is limited to Mr. Morgan's knowledge of the factual results of the trademark investigations, including the full extent of his knowledge on the use of the marks at issue.  BBAM is prohibited from

making any inquiries into privileged information, such as what Mr. Morgan asked of his attorneys, and the legal advice provided by his counsel.

However, because the court recognizes the difficulty in requiring a layperson to differentiate between factual information and privileged information (such as advice of counsel), BBAM is instructed to submit its questions to Burnham Sterling seven (7) days prior to the deposition.  Burnham Sterling may review the questions to determine if they reasonably are designed to elicit factual information, as opposed to privileged information. Counsel are expected to work together, without further assistance from this court, to ensure the questions and topics are consistent with this ruling.

## IV.    DISCOVERY STAY

After the parties each filed their motions to compel (ECF No. 93, 100), the court suspended the scheduling order on October 27, 2021.  *See* Suspension Order, ECF No. 104.  In its order, the court contemplated a "modified scheduling order that will generally push the discovery deadline out by 30 days" after ruling on the pending discovery motions. Burnham Sterling thereafter filed its answer and counterclaims against BBAM.  *See* First Amended Answer and Counterclaims, ECF No. 117-3.  However, because of the court's suspension order, Burnham Sterling could not conduct discovery on any of its counterclaims.  Accordingly, Burnham Sterling filed a motion requesting leave from the court to seek limited discovery on one of its counterclaims—an unfair competition claim under California law which the parties have dubbed as the "UCL claim."  Defs. Mot. for Leave from Case Suspension, ECF No. 130.  BBAM has moved to dismiss all of the counterclaims against it—including the UCL claim—and has moved for a protective order

seeking to delay the discovery sought by Burnham Sterling until after the court's resolution of its motion to dismiss.  Pls. Cross Mot. for Protective Order, ECF No. 150.

As an initial matter, and in accordance with the court's previous suspension order, the court hereby **LIFTS** the suspension on the scheduling order given the resolution of the parties' motions to compel.  The parties shall have an additional sixty (60) days to complete discovery.  Accordingly, Burnham Sterling's motion to seek leave from the court's case suspension is **DENIED** as moot.   However, BBAM's pending motion for a protective order to stay discovery of Burnham Sterling's UCL claim is **GRANTED** for the reasons indicated below.

a.  Burnham's Protective Order to Stay Discovery on Burnham's UCL Claim

Federal Rule of Civil Procedure 26(c) provides, in relevant part, that "[t]he court may, for good cause, issue an order to protect a party or person from . . . undue burden or expense, including," an order "forbidding . . . discovery."  Fed. R. Civ. P. 26(c)(1)(A). "[A] request for a stay of discovery, pursuant to Rule 26(c) is committed to the sound discretion of the court based on a showing of good cause." *Stanley Works Israel Ltd. v. 500 Grp., Inc.*, No. 3:17-CV-01765 (CSH), 2018 U.S. Dist. LEXIS 70217, 2018 WL 1960112, at *2 (D. Conn. Apr. 26, 2018).

Courts typically do not stay discovery upon the filing of a motion to dismiss.  *See, e.g., Kollar v. Allstate Ins. Co.*, No. 3:16-CV-01927 (VAB), 2017 U.S. Dist. LEXIS 223664, 2017 WL 10992213, at *1 (D. Conn. Nov. 6, 2017) ("[T]his Court's regular practice normally requires the parties to commence discovery, even while a motion to dismiss is pending").  The court's Standing Order on Pretrial Deadlines states that "[t]he filing of a motion to dismiss shall  not result  in  a stay of discovery or  extend  the  time  for

completing discovery."   ECF   No.   6.   However, ""[w]here   a   party   seeks
a stay of discovery pending resolution of a dispositive motion, the Court considers (1) the
strength of the dispositive motion; (2) the breadth of the discovery sought; and (3) the
prejudice a stay would have on the non-moving party."  *Stanley Works Isr. Ltd. v. 500
Grp., Inc.*, No. 3:17-CV-01765 (CSH), 2018 U.S. Dist. LEXIS 70217, 2018 WL 1960112,
at *2 (D. Conn. Apr. 26, 2018).

With respect to the first factor—the strength of the dispositive motion—the court
notes at the outset that it continues to review the briefing on BBAM's motion to dismiss,
and it will not provide any insight into the outcome of the motion.  It is undeniable,
however, that BBAM has at least presented a number of substantial arguments for
dismissing the UCL claim, including: (1) that the claim impermissibly expands the scope
of the case in the late stages of litigation; (2) that California's unfair competition law
("UCL") does not apply to the alleged securities violations; or (3) that the UCL also does
not apply to extraterritorial transactions; (4) that Burnham Sterling lacks standing to assert
the UCL claim; and (6) that there is no substantive violation of the UCL.  Although courts
typically restrain from commenting on the strength of a motion prior to issuing a ruling,
many courts likewise have recognized the need for a discovery stay where the
"arguments are substantial" and "not unfounded in the law."  *ITT Corp. & Goulds Pumps,
Inc. v. Travelers Cas. & Sur. Co.*, No. 3:12CV38(RNC), 2012 U.S. Dist. LEXIS 100033,
at *10 (D. Conn. July 18, 2012) (granting stay of discovery); *see also Shulman v. Becker
& Poliakoff, LLP*, No. 17-CV-9330 (VM) (JLC), 2018 U.S. Dist. LEXIS 175771, at *10
(S.D.N.Y. Oct. 11, 2018).

With respect to the breadth of the discovery sought, the court finds that opening discovery on the UCL claim could lead to "unnecessary expenditures of time and resources." *See Buffalo Emergency Assocs., LLP v. UnitedHealth Grp., Inc.,* No. 19-CV-1148S, 2020 U.S. Dist. LEXIS 104828, at *3 (W.D.N.Y. June 16, 2020) (granting stay of discovery given complexity of case).  This case has been pending for two years, with significant discovery already taken, and with additional discovery disputes remaining on the court's docket.  *See* Pls. Mot. for Sanctions, ECF No. 206.  Thus, permitting discovery on the UCL claim, which is at risk of dismissal in its entirety, would be "time-consuming, burdensome and expensive."  *ITT Corp.*, 2012 U.S. Dist. LEXIS 100033, at *10.

Burnham Sterling argues that the breadth of discovery sought is limited, and could be concluded within thirty days.  Defs. Mot. for Leave from Case Suspension, ECF No. 130-1 at 6.  However, BBAM, as a counter-defendant, likely would require additional discovery, as well.  Indeed, BBAM has argued that it will need to serve discovery and depose Defendants on a variety of topics.  Moreover, the current production of discovery could not be used, as the UCL claim is unrelated to the trademark infringement claims.

Lastly, the court finds that Burnham Sterling will not be prejudiced if discovery is delayed until after resolution of the motion to dismiss.  Although a stay of discovery may further delay the case, judicial efficiency necessitates resolving the motion to dismiss before discovery begins.  Should the UCL claim survive the motion, the court will provide ample time for Burnham Sterling to conduct the discovery that it needs.  Accordingly, BBAM's motion for a protective order to stay discovery on the UCL claim hereby is **<u>GRANTED</u>.**

## V.   CONCLUSION

Burnham Sterling's motion to compel (ECF No. 93) the withheld communications identified as BBAM-PRIV00484 – BBAM-PRIV00502 hereby is **DENIED**.

BBAM's motion to compel (ECF No. 98) is **DENIED in part and GRANTED in part**.  The court will conduct a limited *in camera* review of the documents listed in Exhibit 1 of BBAM's motion to compel (ECF No. 100-1).  Burnham Sterling must submit these documents to chambers within ten (10) days of this ruling.  Each document must contain the same bates stamp identifier as those listed by BBAM in Exhibit 1 to its Motion to Compel.  *See* Ex. 1, ECF No. 100-1 at 11–13.  The court will determine whether the factual information in the documents may be produced with redactions, and without revealing privileged information.  To the extent that the factual information is inextricably linked with privileged communications, the court will mark the document as privileged.  The court also grants BBAM's request for a supplemental 30(b)(6) deposition of Mr. Morgan, pursuant to the procedures noted above.  All other requests within BBAM's motion to compel hereby are **DENIED**.

The court hereby lifts the case suspension on the scheduling order and permits an additional sixty (60) days for the parties to conclude discovery on BBAM's claims.  The court hereby **GRANTS** BBAM's motion for a protective order to stay discovery on Burnham Sterling's pending UCL claim until after the court adjudicates the motion to dismiss.

**For all future briefings, the parties hereby are ordered to include the court's docket number (ECF No.) in any citation that refers to a document previously filed on the court's docket.**

**IT IS SO ORDERED.**   Signed this 29th day of August, 2022, at Hartford, Connecticut.

/s/ Omar A. Williams
Omar A. Williams
United States District Judge