## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BBAM Aircraft management LP and BBAM US LP, | ) ) | |
|     *Plaintiffs and Counterclaim Defendants,* | ) ) ) | Case No. 3:20-cv-1056 (OAW) |
| v. | ) ) | |
| Babcock & Brown LLC, Burnham Sterling & Company LLC, Babcock & Brown Securities, LLC, Babcock & Brown Investment Management LLC, | ) ) ) ) | |
|     *Defendants and Counterclaim Plaintiffs* | ) ) | |

## RULING ON PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

**THIS ACTION** is before the court upon Plaintiffs' and Counterclaim Defendants' (the "Plaintiffs") Motion to Dismiss Counterclaims and its accompanying memorandum of law ("Mot. to Dismiss").  ECF No. 232.  The court has reviewed the motion, Defendants and Counterclaim Plaintiffs' (the "Defendants") opposition to the motion, ECF No. 235, and Plaintiffs' reply in support of the motion, ECF No. 240.  For the reasons stated below, the court also has reviewed Plaintiffs' Motion to Dismiss Counterclaims, ECF No. 139, Defendants' opposition thereto, ECF No. 167, and Plaintiffs' reply in support thereof, ECF No. 171.  For the reasons discussed herein, the motion is **GRANTED.**

I.      **FACTUAL BACKGROUND**

A.      **Plaintiffs' Allegations**

On September 1, 2022, BBAM Aircraft Management LP and BBAM US LP (collectively "Plaintiffs" or "BBAM") filed their second amended complaint ("SAC").[1]  The SAC alleged that Defendants Babcock & Brown LLC, Burnham Sterling & Company LLC, Babcock & Brown Securities LLC, and Babcock & Brown Investment Management (collectively "Defendant" or "Burnham Sterling Group") intentionally and willfully infringed BBAM's trademark rights.  *See* Second Am. and First Suppl. Compl. 1, ECF No. 229.

BBAM, collectively, is "an aircraft leasing and asset management company."  *Id.* First starting as an operating entity under Babcock & Brown LP in 1992, BBAM converted into a limited liability company and changed its name to Babcock & Brown Aircraft Management in 1994. *See id.* at 6.  Until 2010, BBAM had operated as a subdivision of Babcock & Brown LP, when Babcock and Brown went out of business.  *See id.* at 2.  At that time, BBAM's management acquired Babcock & Brown aircraft leasing business, including Babcock & Brown Aircraft Management LLC.  *See id.* at 6.  Following this acquisition, BBAM converted into a limited partnership, changed its name to BBAM Aircraft Management LP, and continued to operate in the aircraft and financing space. *See id.* at 6–7.

Specifically, as to the rights to the BBAM marks and logos, Plaintiffs allege that "[t]hrough the 2010 transaction," BBAM management had "acquired ownership of the entire aviation business," including "all assets of the Babcock & Brown Aircraft

---

[1] The original underlying complaint was brought on July 27, 2020.  However, previously having granted Plaintiffs' motion for leave to amend, *see* Order, ECF No. 227, the court takes the second amended complaint as the operative complaint.

management division." *Id.* at 7. Among such assets was the right to "exclusive use of the Babcock & Brown name in the aviation field." *Id.* BBAM would also have the right of first refusal, should the "Babcock & Brown name ever be put up for sale." *Id.*

BBAM alleges several ways it uses the mark and logos. For example, BBAM's use expands to the Japanese operating lease ("JOL") market, where Plaintiffs entered an "exclusive joint-marketing partnership with the Japan-based Nomura Babcock & Brown." *Id.* at 8; *see id.* at 15–17. Moreover, BBAM asserts that the mark and logo are prominently featured on BBAM's website, along the history of BBAM ownership and operation. *See id.* at 9–11. As another example, the mark and logo are used to solicit business and investments. *See id.* at 11. When companies affiliated with BBAM use the mark and logo, it is with express authorization of BBAM. *See id.* at 13.

Plaintiffs further allege that Michael Dickey Morgan "directly or indirectly" is the sole owner and manager of each named Defendant entity. *Id.* at 17. Morgan had been employed by Babcock & Brown LP within BBAM's aviation business, but in 2010, when Babcock & Brown went out of business, he allegedly started a business that "competes directly with BBAM in the aviation industry." *Id.* at 17. The SAC states that through discovery, Plaintiffs have been using the logo and marks in connection with "offering of and sale of services in the aircraft leasing and asset management industries since July 2020." *Id.* at 18. Plaintiffs suggest that Defendants Babcock & Brown LLC and Babcock & Brown Investment Management were created not to render any financial services, but to create a sense of "false association" with the Babcock & Brown name. *Id.* at 18.

For instance, Plaintiffs note that Burnham Sterling had filed a trademark application for the "BURNHAM BABCOCK & BROWN" word mark, in connection with various

financial services. *Id.* However, when Burnham Sterling allegedly assigned its interest in the mark to Defendant Babcock & Brown LLC on January 14, 2021, the pending application had been legally invalidated, because "no portion of Burnham Sterling's [financial services] was conveyed in the assignment of the application. *Id.* Moreover, BBAM claims that its use of the word mark predates Burnham Sterling's use. *See id.* at 20. Despite this, however, the word mark was displayed across Burnham Sterling's website and various social media pages, such as Facebook and LinkedIn, where Burnham Sterling allegedly made "express, literally false claims of affiliation or continuation with Babcock & Brown and/or BBAM." *Id.* at 19–20.

Pointing to facts uncovered during discovery, Plaintiffs allege that Babcock & Brown Securities LLC similarly uses the word mark in selling, purchasing, and advising clients on securities transactions. *See id.* at 21. Plaintiffs state that BBAM's use of the word mark also predates use of the same by Babcock & Brown Securities LLC. *See id.*

Similar allegations are raised against Defendant Babcock & Brown LLC, which Plaintiffs claim was formed by Michael Dickey Morgan around November 2014. *See id.* Babcock & Brown LLC had applied for various trademarks with all applications declaring that the Babcock & Brown LLC word marks would be used, albeit in varying capacities, within commercial and financial industry unrelated to aviation financing.[2] *See id.* at 21–22. Each of the trademark applications requires that the applicant file a subsequent statement to verify the use of each mark. *See id.* at 23. Despite having filed multiple

---

[2] The SAC notes that the applications listed the following kinds of use: "investment management," "investment banking; financial consultation; financial analysis; capital investment and private equity fund management; and financial advisory services in the fields of asset-backed financings, project financings, leveraged leases, sale leasebacks, portfolios of leased or financed assets, secured debt, tax-advantaged financings; financial advisory services in the fields of financing equipment purchasing, financing equipment leasing, and financing equipment sales." Second Amended and First Suppl. Compl. 21–22, ECF No. 229 ("SAAC").

requests to extend the deadline to submit these forms, at the time the SAC was filed, Plaintiffs allege that Defendants had not submitted such statements, nor used the word marks in the manner described in the application.  *See id.*  BBAM's use of the word mark also allegedly predates the usage by Defendants.  *See id.* at 24.

Plaintiffs raise similar allegations against the last of the named Defendants. Babcock & Brown Investment Management is alleged to be an entity formed by Michael Dickey Morgan in or around December 2015.  *See id.* at 24–25.  Despite its name, the entity is alleged to never have rendered any investment management services.  *See id.* at 25.  Rather, Plaintiffs suggest that it chose its name simply to create a connection to the Babcock & Brown mark.  *See id.* at 24–25.  BBAM's usage of the mark is alleged to precede the usage by Babcock & Brown Investment Management.  *See id.* at 25.

Plaintiffs conclude by arguing that the conduct described above reflects the willful action of each Defendant, which will cause confusion within the market and harm to Plaintiff.  *See id.* at 25–29.

To summarize the factual and legal allegations, Plaintiffs raise six claims:

1) Trademark Infringement, 15 U.S.C. § 1114(1) against all Defendants;

2) False Designation of Origin, Affiliation, Connection and Sponsorship, 15 U.S.C. § 1125(a)(1)(A) against all Defendants;

3) Connecticut Common Law Trademark Infringement against all Defendants;

4) False Advertising, 15 U.S.C. § 1125(a)(1)(B), against all Defendants;

5) State and Common Law Unfair Competition against all Defendants;

6) Cancellation of U.S. Trademark, 15 U.S.C. §§ 1052(d), 1064, 119 against Defendant Babcock & Brown LLC[3]; and

7) Refusal of Trademark Application, 15 U.S.C. §§ 1052(d), 1119 against Defendant Babcock & Brown LLC[4]

### B.   <u>Defendants' Allegations</u>

Defendants deny liability under any of the claims brought forth by Plaintiffs, and instead raise affirmative defenses that they did not commit any infringement, unfair competition, or false advertising.  *See* Defs.' Answer & Countercl. to Pls.' Second Am. and First Suppl. Compl. 20, ECF No. 231 ("Defs.' Countercl.").  Defendants also challenge the validity of Plaintiffs' trademark rights and go on to raise defenses of trademark abandonment.  *See id.* at 20–21.  From there, they raise a laundry list of defenses, including estoppel, laches, innocent infringement/fair use, no damage, and failure to mitigate, irreparable harm, and failure to state a claim for relief.  *See id.* 21–24.

Defendants then proceed to raise a counterclaim, alleging a different set of events. They refer to the named Defendants as the "Burnham Sterling Group," and agree that it and BBAM are "spin-offs" of Babcock & Brown LP.  *See id.* at 25.  They claim that after the liquidation of Babcock & Brown LP in 2010, two groups of U.S.-based employees sought to continue the aircraft financing service.  *See id.* at 32.  One was led by Morgan, who formed Burnham Sterling, and established a presence in Connecticut.  *See id.* Burnham Sterling continued to develop and formed affiliated entities, which include other named Defendants in the action.  *See id.* at 33.

---

[3] Plaintiffs seek the court's cancellation of the following trademark registrations: U.S. Trademark Registration Nos. 5,851,855; 6,037,338; 5,643,846; 5,769,928.  *See* SAAC 40–43.

[4] Specifically for trademark application number 86/874,191.  *See id.* at 44.

Around the time Morgan formed Burnham Sterling, Steve Zissis allegedly formed "Summit Aviation Partners," or "Summit." *Id.* Summit purchased certain ownership interests in Babcock & Brown Aircraft, but the purchase crucially did not include the Babcock & Brown marks. *See* Defs.' Countercl. 33. Rather than continuing to use the name marks, Summit allegedly took multiple steps to distance itself from the Babcock & Brown and B&B name marks. *See* Defs.' Countercl. 33–34 (outlining specific steps). Defendants claim that as a direct result, BBAM is known and recognized simply as "BBAM" rather than "Babcock & Brown Aircraft management." *Id.* at 35.

Having provided this backdrop, Defendants first allege that their references to Babcock & Brown LP have been part of factual and objective representations. *See id.* 35–36 (noting that there was nothing misleading about the promotional and marketing material). Then Defendants claim that Burnham Sterling took affirmative steps to apply for, and secure, rights to those marks. *See id.* at 36–37. The process included not only filing applications with the U.S. Patent and Trademark Office, but also verbally confirming with Zissis that Summit had not been using these marks. *See id.* at 37. Defendants concede that, after having taken these steps, the Burnham Sterling Group has used the name marks in "conducting a small part of its business." *Id.*

Despite the shared roots between BBAM and the Burnham Sterling Group, Defendants allege that the two entities offer different kinds of services within the greater aviation financing industry: BBAM focuses on "operating lease and Japanese lease transactions,"[5] whereas Burnham Sterling arranges "debt and equity financing for aircraft

---

[5] According to the counterclaim, Japanese lease transaction is one in which "an aircraft is leased by a U.S. or non-U.S. airline but owned by one or more Japanese Investors." Defs.' Answer & Countercl. to Pls.' Second Am. and First Suppl. Compl. 25, ECF No. 229 ("Defs.' Countercl.").

purchases." *See id.* Defendants cite to the distinct business model of each entity and the tight-knit nature of the aviation financing market to claim that it would be "all but impossible" for the market to confuse the Burnham Sterling Group with BBAM. *Id.* at 38.

Turning to the crux of their counterclaim, Defendants allege that BBAM's lawsuit represents an attempt to prevent competition. *See id.* at 26. Defendants claim that through the discovery process, the Burnham Sterling Group has discovered that BBAM has gained an unfair or unlawful competitive edge in the Japanese lease market. *See id.* at 40. Allegedly, BBAM has been operating without a broker-dealer registration and license. *See* Sealed Defs.' Countercl. 50. This conduct was not only a violation of federal, but also certain state laws, and allowed BBAM to offer financing products at lower price than its competition, including Defendants, thereby preventing Burnham Sterling Group from breaking into the market in Japan. *See id.* at 51–53. Defendants claim that they have lost "significant revenue" from BBAM's practice, in addition to the time, effort, and resources invested in order to attempt to break into the Japanese lease market. *Id.* at 54–56. Compounding the issues, Defendants claim that BBAM's lawsuit has "damaged or [is] likely to damage" the Burnham Sterling Group's brand and reputation. *See* Defs.' Countercl. 27.

Summing up these allegations, Defendants raise six claims for relief. The first five seek declaratory relief of non-violation, non-infringement. *See id.* at 55–59. In addition to the trademark dispute, Defendants raise an additional claim under California state law against unfair competition ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq. See id.* at 59–61. The UCL claim is founded on Burnham Sterling Group's loss of revenue and potential market share within the Japanese lease market due to BBAM's business conduct.

## II.   PROCEDRUAL HISTORY

The docket is quite expansive, in part because of the complexity of the legal issues and the number of entities that are involved, so a review of the procedural history is warranted.

### A.   Operative Complaint

BBAM initiated this action by filing its complaint on July 27, 2020.  *See* ECF No. 1. The complaint was amended, as of right, by the First Amended Complaint ("FAC") on September 25, 2020.  *See* ECF No. 32.  In response, Defendants filed a motion to dismiss the FAC on October 16, 2020.  *See* ECF No. 39.

The parties began conducting discovery at that point.  *See* Defs.' Resp. in Opp'n to Pls.' Mot. to Dismiss Defs.' First Am. Countercls. 7, ECF No. 168.  Discovery was halted when this court ordered a temporary suspension of the scheduling order.  *See* Order, ECF No. 104.  As a result of this initial discovery, Plaintiffs gained new information with which they sought to amend the FAC.  On September 2, 2021, Plaintiffs moved for leave to amend, such that they may file a Second Amended Complaint.  Through the motion, Plaintiffs did "not seek to add any parties or causes of action" but to make "non-material corrections and clarifications, including updating the factual allegations in the complaint." Pls.' Opposed Mot. for Leave to File Second Am. & First Suppl. Compl. 1, ECF No. 82. Despite Defendants' opposition, the undersigned granted the motion on August 29, 2022. *See* Order ECF No. 227.  Following this order, Plaintiffs filed the SAC.  *See* Second Am. and First Suppl. Compl. ECF No. 229 ("SAC").

The SAC remains the operative complaint.

B.     **Answer & Counterclaim**

Back on September 29, 2021, when the FAC was the operative complaint, the court (Hon. Vanessa L. Bryant, J.) denied Defendants' motion to dismiss.  *See generally* Mem. of Decision, ECF No. 89.  In response to the court's order, Defendants filed an answer to the FAC on October 13, 2021.  *See* ECF No. 95.  In their response, Defendants raised not only affirmative answers, but also counterclaims against Plaintiff's FAC.

On November 4, 2021, Plaintiffs responded by filing a motion to dismiss Defendants' counterclaims.  *See* ECF No. 110.  On November 11, 2021, while the motion was pending, Defendants filed their First Amended Answer and Counterclaims ("FAAC").  *See* ECF No. 118.  In addition to the counterclaims that had been raised by the first responsive pleading, the FAAC included a UCL counterclaim.  *See* Defs.' First Am. Answer & Councercl. to Pls.' First Am. Compl. 63, ECF No. 117-3 ("Defs.' FAAC").

On December 16, 2021, Plaintiffs responded in kind by moving to dismiss the FAAC.  *See* Mot. to Dismiss Defs.' First Am. Countercls., ECF No. 139 (accompanying the memorandum of law docketed separately at ECF No. 142).  This motion became ripe after Defendants filed their response on January 18, 2022, *see* Defs.' Response in Opp'n to Pls.'s Mot. to Dismiss Defs.' First Am. Countercls., ECF No. 167, and Plaintiffs filed their reply briefing on January 25, 2022, *see* Pls.' Reply in Supp. of their Mot. To Dismiss Defs.' First Am. Countercls., ECF No. 171.

When Plaintiffs filed their SAC with the court's approval, Defendants filed another responsive pleading on September 15, 2022, wherein they raised identical counterclaims without notable changes from their FAAC.  *See generally* Defs.' Countercl.

The FAAC contains Defendants' counterclaims in response to Plaintiffs' SAC, and is the focus of this ruling.  However, as Defendants note, Plaintiffs' motion to dismiss Defendants' FAAC is understood to be "essentially a repeat of [Plaintiffs' earlier motion to dismiss, docketed at ECF No. 139]."  Defs.' Resp. in Opp'n to Pls.' Mot. to Dismiss Defs.' Countercls. 1, ECF No. 235.  For this reason, the court references both sets of motions to dismiss Defendants' counterclaims in this ruling.

## III.   <u>LEGAL STANDARD</u>

When reviewing a motion to dismiss, the court may consider the complaint, documents attached thereto, documents incorporated by reference therein, documents relied upon in bringing the action that were in plaintiff's possession or of which the plaintiff had knowledge, and matters subject to judicial notice.  *See Chambers v. Times Warner*, 282 F.3d 147, 152–53 (2d Cir. 2002).

## IV.   <u>DISCUSSION</u>

### A.   <u>Motion to Dismiss UCL Claim under Federal Rules 15 and 16</u>

The court first starts with the California UCL claims raised by Defendants.  Plaintiffs raise a series of arguments through which they assert this claim should be dismissed. The court understands them to be as follows: 1) the defendants filed the FAAC without requesting the court's leave, despite the expiration of the Rule 16 deadline; 2) the FAAC raises late claims that unduly expands the scope of the case; and 3) the UCL claim is not one upon which relief can be granted.  *See* Mot. to Dismiss 1.  Defendants respond,

arguing that the UCL claim was timely filed, is within the scope of the original claim, and is a claim upon which relief can be granted.  The court takes each argument in turn.

        *1.*    *Applicable Federal Rule*

Plaintiffs argue that this UCL counterclaim, which Defendants added as part of their FAAC, should be dismissed as untimely. The court disagrees.

Plaintiffs characterize the FAAC as a Rule 15(a) amendment as a matter of course "after the Rule 16 deadline to amend pleadings had passed."  Mem. in Supp. of Pls.' Mot. to Dismiss Defs.' Countercls. 10, ECF No. 232-1 ("Mem. of Law of Mot. to Dismiss"). Because the Rule 16 has passed, Plaintiffs continue, Defendants were required to seek leave before they could amend their counterclaims.  *See id.*  Defendants' contention is that the FAAC timely was filed after Plaintiffs moved to dismiss Defendants' initial answer and counterclaims.  *See* Defs.' Resp. in Opp'n to Pls.' Mot. to Dismiss Defs.' First Am. Countercls. 23–24, ECF No. 168.

Federal Rule of Civil Procedure 15(a)(1) allows a party to amend its pleading "once as a matter of course" under two circumstances. *See* Fed. R. Civ. P. 15 advisory committee's note to the 2009 amendment ("Abrogation of Rule 13(f) establishes Rule 15 as the sole rule governing amendment of a pleading to add a counterclaim.").  First, an amended complaint may be filed "no later" than "21 days after serving [the original complaint]."  Fed. R. Civ. P. 15(a)(1)(A).  Second, it may be filed "if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under [Federal Rule of Civil Procedure] 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ. P. 15(a)(1)(B).

Defendants' FAAC was filed on November 11, 2021, *see* ECF No. 117, after Plaintiffs had filed a motion to dismiss Defendants' initial set of affirmative responses and counterclaims on November 3, 2021*, see* ECF No. 110.   Because a counterclaim is a pleading "to which a responsive pleading is required," the timeliness of this amendment is determined by Federal Rule 15(a)(1)(B).   *See GEOMC Co. Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 101 n.14 (2d Cir. 2019).   Reviewed under the appropriate rule, the court finds that Defendants' FAAC falls squarely within the time allotted by Federal Rule 15(a)(1)(B).   Because Plaintiffs' motion to dismiss was filed pursuant to Federal Rules 12(b)(1) and 12(b)(6), Defendants had twenty-one days from the time of service to file an amended counterclaim as of right.   *See* Fed. R. Civ. P. 15(a)(1)(B). Because Defendants could amend their pleading as a matter of course without the court's leave, Plaintiffs' contention is unavailing.

Plaintiffs next suggest that Defendants' FAAC was filed after the Rule 16 deadline to amend the pleadings.   Mot. to Dismiss 10.   By "Rule 16 deadline," the parties refer to the deadline of October 30, 2020, which the parties themselves had determined by filing a Rule 26(f) Report.   *See* Joint Report of Rule 26(f) Planning Meeting 5–6, ECF No. 34. The court disagrees with Plaintiffs' argument.

To start, the report clearly reads that "*Plaintiffs* should be allowed until October 30, 2020, to file motions to join parties and until October 30, 2020 to file motions to amend the pleadings."   *Id.* at 5 (emphasis added).   The language of the report supports Defendants' argument that this deadline to amend pleadings applies only to Plaintiffs. *See* Defs.' Resp. in Opp'n to PLs.' Mot. to Dismiss Defs.' Countercls. 3, ECF No. 235. Plaintiffs correctly note the language of Federal Rule 16(b)(3)(A) suggests that scheduling

deadlines typically are applicable to the case, generally, and bind all parties and not just the plaintiffs. *See* Reply in Supp. of Pls.' Mot. to Dismiss Defs.' Countercls. 2, ECF No. 240. However, the parties opted to file this Rule 26(f) Report with the language as reflected in the filing. Notably, the language adopted in the parties' Report is different from the template language provided by the District of Connecticut. *See* U.S. Dist. Ct., Dist. of Conn., Local Rules of Civil Procedure 99–105 (2017), https://ctd.uscourts.gov/sites/default/files/Revised-Local-Rules-01-31-2021.pdf [https://perma.cc/WNF7-4FU7].[6] The template form provided by the District of Connecticut dedicate, in a bulleted list, statements which suggest to the parties that they may agree to limit the timeframe within which the defendant may file an amended pleading. *See id.* at 102 ("Defendant(s) should be allowed until [date] to file motions to join additional parties and until [date] to file a response to the complaint, or any amended complaint."). The court finds that the statements included in this form should have served as adequate notice that the parties could have decided to limit the timeframe during which the defendant would need to file an amended pleading. Plaintiffs' failure to limit Defendants' amendment period also renders this argument unavailing.

Moreover, this court (Hon. Vanessa L. Bryant, J.) honored the parties' filing and self-declared deadlines. Its scheduling order adopted the date proposed by the parties and explicitly reiterated only a few deadlines, including the deadline for discovery, dispositive motions, and trial readiness. *See* Scheduling Order, ECF No. 35. As explained by the United States Court of Appeals for the Second Circuit, the time period

---

[6] The latest iteration of the Local Rules of the District of Connecticut reflect that the Form 26(f) Report of Parties Planning Meeting was last amended on December 22, 2017, which was well before the parties filed their 26(f) Report in this case. *See* Joint Report of Rule 26(f) Planning Meeting, ECF No. 34 (reflecting a filing date of October 1, 2020).

to "freely amend" pleadings can be determined "either upon expiration of a specific period in a scheduling order or upon expiration of the default period set forth in Rule 15(a)(1)." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021).  Plaintiffs cite to *Kassner v. 2nd Ave. Delicatessen, Inc.*, for the proposition that time allotted under Rule 15(a)(1)(B) to freely amend "is subject to the district court's direction to limit the time for amendment of the pleadings in a scheduling order issued under Rule 16(b)."  Reply in Supp. of Pls.' Mot. to Dismiss Defs.' Countercls. 2, ECF No. 240 (citing 496 F.3d 229, 224 (2d Cir. 2007)). While the Second Circuit's ruling is instructive, it is not applicable here because the court refrained from exercising its discretion in limiting the time allotted under Rule 15(a)(1)(B). Instead, the court adopted the deadlines as proposed without limiting the date by which the defendants were required to file their amended pleading.  Without any orders to the contrary, the "default period" applied.  *Sacerdote*, 9 F.4th at 115.  Defendants' FAAC meets this default period.  *See GEOMC Co.*, 918 F.3d at 101 n.14 (ruling that a defendant may elect to include in an amended answer a new counterclaim).

Finally, Plaintiffs cite to the ruling issued by the undersigned, clarifying that "motions to amend the pleadings after October 30, 2020, will require a showing of good cause for the delay."  Ruling on Pls.' Mot. to Amend Compl. 9, ECF No. 227.  In doing so, however, Plaintiffs omit the context in which the court so declared: the requirement of showing of good cause was issued in response to Plaintiffs' motion for leave to amend, not Defendants'.  Without having expressed a heightened requirement for the defendants, the "default" requirement of Federal Rule 15(a)(1)(A) was still in effect.  Defendants have satisfied this default requirement.

2.    _Second Circuit Precedent_

Plaintiffs dedicate a significant part of the briefing to analyzing the prejudice and untimeliness of the FAAC.  However, their argument is misplaced.  As ruled above, Defendant's FAAC is governed by Federal Rule 15(a)(1)(B).  Because the FAAC was filed "as of course," the court lacks the authority to even begin to apply the *GEOMC* framework of analysis for determining prejudice.  Fed. R. Civ. P. 15(a)(1)(B) (stating that the moving party need not seek permission from the court nor the consent of the opposing party).

The *GEOMC* Court itself was clear in stating that "in ruling on a motion to dismiss a new counterclaim, a district court can either assess the new counterclaim's legal sufficiency *or* exercise the discretion the court would have been entitled to use if the counterclaimant had moved under Rule 15 to file the new counterclaim."  *GEOMC Co.*, 918 F.3d at 101 (emphasis added).  At this crossroad, the *GEOMC* Court proceeded to review the new set of counterclaims under Rule 15 standard, analyzing the kind of prejudice that the counterclaims could cause for the opposing party.  *See id.* at 102.  But that case is easily distinguishable from the one at bar because, from the outset, Defendants had not required the court's permission to file the FAAC.  Therefore, the court must deviate from the *GEOMC* Court in its subsequent steps of analysis by instead examining the legal sufficiency of Defendants' FAAC.

**B.    Motion to Dismiss UCL Claim Under Rule 12(b)**

Having established the procedural framework of analysis, the court again relies on the holding of the *GEOMC* Court:

> [I]f a new counterclaim raising issues beyond the scope of the most recent amended complaint is filed so late in the litigation, the new counterclaim may be challenged by (1) by a Rule 12(b)(6) motion if relevant undisputed facts appear on the face of the pleadings or in the record, (2) by a Rule 56 motion if relevant

undisputed facts can be presented by affidavit, or by (3) by an answer under Rule 8(c) if relevant facts are in dispute.

*GEOMC Co.*, 918 F.3d at 101.  In so many words, the Second Circuit instructs that Plaintiffs, in seeking to dismiss the FAAC, may revert to Rule 12(b)(6) for motion to dismiss, Rule 56 for a summary judgment, or Rule 8(c) by providing an affirmative response.  *See Day v. Moscow*, 955 F.3d 807, 811 (2d Cir. 1992); 2 Moore's Federal Practices § 12.37[3] (3d ed. 2018); 5C Wright & Miller, § 1380, at n.5 (3d ed. 2018).  Finding that Plaintiffs' motion is best construed as a motion to dismiss, the remaining analysis for Defendants' UCL counterclaim is reviewed under such a standard.

### 1.   *Legal Standard under Rule 12(b)(6)*

To withstand a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  The plausibility standard is not a probability requirement; the pleading must show, not merely allege, that the pleader is entitled to relief.  *Id.*  Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to a presumption of truth.  *Id.*  "To state a plausible claim, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'"  *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555).  However, when reviewing a motion to dismiss, the court must draw all

reasonable inferences in the non-movant's favor.  *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012).

2.   <u>California's UCL and the Nature of Plaintiff's Claim</u>

 Known as California's "little FTC Act," *Bowen v. Ziasun Techs., Inc.*, 116 Cal. App. 4th 777, 786 (2004), California Business & Professions Code § 17200 provides from the outset that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising."  "It is well known that the purpose of the UCL is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services."  *Law Offs. of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 552 (2013) (internal quotations omitted).

Because the language of the state statute prohibits unlawful, unfair, or fraudulent business act, "an act can be alleged to violate any or all of the three prongs of the UCL." *S.F. Residence Club, Inc. v. Amado*, 773 F. Supp. 2d 822, 833 (N.D. Cal. 2011) (citing *Berryman v. Merit Prop. Mgmt., Inc.*, 152 Cal. App. 4th 1544, 1554 (2007)).  California courts have understood this provision to reflect "broad sweeping language," which provides "courts with broad equitable powers to remedy violations."  *Law Offs. of Mathew Higbee*, 214 Cal. App. 4th at 552 (internal citation omitted).  Defendants' counterclaim appeals to two of the three prongs, as the UCL claim alleges that "BBAM has engaged in unlawful and unfair" business acts and practices.  FAAC 63.

Defendants' UCL claim alleges that Plaintiffs' current business practices within the Japanese lease financing industry has prevented them from expanding its business and breaking into the Japanese Lease financing market.  *See* FAAC 27.  Plaintiffs are able to

do this, Defendants claim, because Plaintiffs have "been able to price [their] products at a lower rate" by allegedly bypassing the licensing requirements (and the cost of registration) under U.S. and Japanese Law.  *See id.*  First, Plaintiffs respond with two arguments: 1) that § 17200 does not apply to this case because Defendants' claims are barred under *Bowen*'s holding, and 2) that § 17200 does not apply to extraterritorial transactions.  *See* Mem. of Law of Mot. to Dismiss 20–21.  Thereafter, Plaintiffs argue that Defendants cannot establish standing for the counterclaim, before arguing as to the substantive claims themselves.  The court takes each argument in turn.

### 3.    *The Holding of* Bowen v. Ziasun Technologies

Plaintiffs' first argument is unavailing.  Plaintiffs misconstrue the holding of *Bowen* as has been understood by federal and state courts of California since its first issuance.  Because Defendants' counterclaims do not "arise from any stock transactions *between parties*," the holding of *Bowen* does not preclude Defendants' UCL claim.  *Benson v. JP Morgan Chase Bank, N.A.*, Nos. C-09-5272 EMC, C-09-5560 EMC, 2010 WL 1526394, at *8 (N.D. Cal. 2010) (emphasis added).

California's Fourth District Court of Appeal in *Bowen v. Ziasun Technologies, Inc.* recognized the following exclusion within § 17500: "section 17200 does not apply to securities transactions."  116 Cal. App. 4th at 530–31.  Since the ruling, "courts have narrowed *Bowen's* broad language and have allowed Section 17200 claims to proceed where the claims were tangentially related to securities transactions."  *Betz v. Trainer Wortham & Co., Inc.*, 829 F. Supp. 2d 860, 866 (N.D. Cal. 2011).  While the holding of *Bowen* remains the law of California, *see Siegal v. Gamble*, No. 13-cv-3570(RS), 2016 WL 1085787, at *7–8 (N.D. Cal. Mar. 21, 2016), the ruling is understood only to "bar

lawsuits based on deceptive conduct in the sale and purchase of securities, nothing more." *Benson*, 2010 WL 1526394, at *8. Therefore, the holding of *Bowen* does not apply to cases which involve "securities in a general sense." *S.F. Residence Club, Inc. v. Amado*, 773 F. Supp.2d 822, 834 (N.D. Cal. 2011).

The crux of Defendants' counterclaim is that Plaintiffs' allegedly unlawful conduct has pushed them out of the Japanese Lease market. In other words, Defendants are bringing this counterclaim as a prospective competitor within the market. *See* FAAC 27. Given this dynamic, the alleged harm does not resort from Defendants' securities transactions with Plaintiffs. Rather, the injury stems from the effect that Plaintiffs' conduct has on the market as a whole. This type of conduct is well within the scope of § 17200. *See Law Offs. of Mathew Higbee*, 214 Cal. App. 4th at 551 (ruling that UCL was "concerned primarily with wrongful conduct in commercial enterprises which resulted in business loss to another"). While Plaintiffs' conduct has ties to securities and transactions thereof, it is clear that the *Bowen* holding does not apply to this case.

The first distinction is that Defendants bring this counterclaim not as a consumer, but as potential competitor to Plaintiffs. Unlike the claim brought by Defendants to this case, the plaintiffs in *Bowen* sued a publicly traded Nevada corporation in their capacity as consumers. *See Bowen*, 116 Cal. App. 4th at 779–80. They alleged that the defendant had been perpetrating a pyramid or Ponzi scheme, selling hundreds of thousands of its stock and stocks of other publicly traded companies "by making misstatements and omissions of material fact." *Id.* at 523. This clarifies why *Bowen* referenced the decisions of "15 other jurisdictions" which, by that time, had considered whether investment securities are within the scope of [the jurisdictions'] *consumer protection statues*." *Id.* at

530 (emphasis added*).  Bowen* further elaborated that "[a]ctions involving securities, such as the one alleged in this case, are not typically on the agenda of *consumer advocates*." *Id.* at 531 (emphasis added).  Accordingly, *Bowen*'s preclusion of claims based on securities transactions looks most naturally to apply to consumer protection claims brought by those who purchase securities rather than by those who sell or market securities.

Such reading is consistent with the holdings of California courts, both state and federal.  *See, e.g.*, *Betz v. Trainer Wortham & Co., Inc.*, 829 F. Supp. 2d. 860, 867–68 (N.D. Cal 2011) (ruling that the claim was precluded because it "unavoidably focuses on the purchase of securities" by plaintiff); *Overstock.com, Inc. v. Gradient Analytics, Inc.*, 151 Ca. App. 4th 688, 716 (2007) (ruling that the plaintiff's claim was not precluded because the claim dealt with "the effect of the defendants' actions on the consumer market"); *EnSource Invs. LLC v. Willis*, No. 3:17-cv-79-H-LL, 2019 WL 6700403,* 16 (S.D. Cal. Dec. 6, 2019) (ruling that plaintiff's claims are precluded because the "case revolved around [plaintiff's] purchase and sales of securities of [the defendant]'").  Plaintiffs' argument based on *Siegal v. Gamble* fails for this reason: the plaintiffs in *Siegal* had "purchased securities" from the defendants.  No. 13-cv-3570-RS, 2016 WL 1085787, at *1–3 (N.D. Cal. Mar. 21, 2016).

Second, Defendants' counterclaim focuses not on Plaintiffs' securities transaction, but of Plaintiffs' predicate conduct in failing to register as broker-dealers with the relevant authorities, which had the effect of preventing Defendants from entering the Japanese Lease Market.  *See* FAAC 24; *see also Willis*, 2019 WL 6700403, at *16 (precluding a UCL claim by following California precedent which had dismissed claims where "the

predicate acts are securities transactions).  Defendants' claim does not target Plaintiffs' securities transactions, but their allegedly unlawful business model of lowering prices by cutting the cost of registration.  Close reading of the FAAC confirms this, as Defendants' allegation states that "[b]ecause BBAM has been able to *offer* its leasing financing products at subsidized rates, it has been able to prevent companies like the Burnham Sterling Group from successfully entering the Japanese Lease financing market."  FAAC 27 (emphasis added).  In other words, Defendants' claim is not contingent upon whether Plaintiffs engaged in securities transactions at all.  California courts suggest against dismissing claims under *Bowen*'s precedent where the UCL claim does not "target a securities transaction."  *S.F. Residence Club, Inc.*, 773 F. Supp. 2d at 834.

In all, the *Bowen* holding that "securities transactions are not covered under the UCL bars lawsuits based on deceptive conduct in the sale and purchase of securities, nothing more."  *Overstock.com, Inc.*, 151 Cal. App. 4th at 715.  Where, as here, Defendants' counterclaim is based on the effect of Plaintiff's actions on the consumer market, the UCL claim may not be precluded by the conduct's tangential ties to securities transactions.  *See id.* at 716.  Finding that *Bowen* and its progeny of cases do not preclude this claim, the court next looks to whether Defendants' UCL counterclaims may reach transactions in Japan.

### 4.   Extraterritorial Application of UCL

Plaintiffs argue that "because all transactions alleged in [the FAAC] occurred in Japan between third-party Nomura Babcock & Brown and Japanese investors," the UCL Claim must be dismissed.  Mem. of Law of Mot. to Dismiss 24.  Defendants reply by

characterizing California as the "locus of the unlawful activity." Defs.' Resp. In Opp'n to Pls.' Mot. to Dismiss Defs.' First Am. Countercls. 16, ECF No. 167.

Plaintiffs cite to *Morrison v. National Australia Bank Ltd.*, for the proposition that the Securities Exchange Act and the state "Blue Sky" statutes are limited in scope to "purchases and sales of securities in the United States."  561 U.S. 247, 267 (2010); *see Edgar v. MITE Corp.*, 457 U.S. 624, 641 (1982) (ruling that "blue-sky laws . . . only regulate[] transactions occurring within the regulating States").

A securities transaction occurs when the parties "incur irrevocably liability" or when "title passes." *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 67–68 (2d Cir. 2012) (citing *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876 (2d Cir 1972)). To classify a transaction as domestic, the irrevocable liability or transfer of title must occur in the United States.  *In re Petrobras Secs.*, 862 F.3d 250 (2d Cir. 2017) (citing Absolute Activist, 677 F.3d at 67)).  The timing of a securities transaction is determined by looking to the time when the parties become committed to one another.  *See Goldmuntz*, 464 F.2d at 891.  This commitment is understood as "a meeting of the minds of the parties," or "the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time." *See Goldmuntz*, 464 F.2d at 891.  This timing is important because "territoriality under *Morrison* concerns where, physically, the purchaser or seller committed him or herself." *United States v. Vilar*, 729 F.3d 62, 77 n.11 (2d Cir. 2013).  The location of the broker-dealer may be important to the extent that the broker-dealer "carried out tasks . . . that irrevocably [bound] the parties." *Absolute Activist*, 677 F.3d at 68.

Under this standard, Defendants have failed to establish that the alleged transactions are domestic. Plaintiffs' involvement in Japanese Lease transactions is limited to "actions needed to carry out the transactions, and not the transactions themselves." *Loginovskaya v. Batratchenko*, 764 F.3d 266, 274–75 (2d Cir. 2014). Allegations that Plaintiffs somehow were involved in offering the securities in question is insufficient to finding the transaction to be domestic. *See Absolute Activist*, 677 F.3d at 70; *see also Arco Cap. Corps. Ltd. v. Deutsche Bank AG*, 949 F. Supp. 2d 532, 541–42 (S.D.N.Y. 2013) (suggesting that factual allegations concerning "formation of contracts, the placement of purchase orders, the passing of title, or the exchange of money" may be sufficient to satisfy the domestic transaction test under *Morrison*). The transaction itself is conducted between the investors and the airline seeking to lease the aircraft. *See* SAC 5. Liability is incurred between the airlines and the investors. *See id.* Plaintiffs may have played a significant role in the exchange of this liability, but the nature of the transaction primarily is determined by assessing the activities of the involved parties. *See Absolute Activist*, 677 F.3d at 68–69. The parties themselves have virtually no ties to the territorial United States. At most, Defendants allege that the parties to the Japanese Lease transactions may have conferred with employees in the United States, met with investors in the United States, or attended marketing meetings and retreats in America. *See* Defs.' Countercl. 44–45. Defendants fail to establish that any liability was incurred during these instances, suggesting that the "locus of [the] securities purchase" lies elsewhere. *Absolute Activist*, 677 F.3d at 68.

Accordingly, Defendants' UCL counterclaim must be dismissed. However, in light of the recent Second Circuit precedent, *see* Pls.' Notice of Supplemental Authority 4, ECF

No. 260 (citing to *Williams v. Binance*, No. 22-972, 2024 WL 995568 (2d Cir. Mar. 4, 2024)), the court shall dismiss the UCL counterclaim without prejudice, subject to renewal, such that Defendants may raise allegations to support their claim that Plaintiffs' Japanese Lease transactions fall within the ambit of the Exchange Act.

**C.    Motion to Dismiss Declaratory Relief Counterclaims**

Having dismissed the UCL counterclaim, the court next looks to Defendants' counterclaims seeking declaratory relief.   The first five of Defendants' claims pray for declaratory relief, each pursuant to differing authorities.  *See* FAAC 58–63.

Plaintiff's raises two central contentions. First, Plaintiffs argue that these claims fail to establish "independent basis for justiciability" as they are "mirror images" of their second amended complaint.   Mem. of Law of Mot. to Dismiss 35.   Second, Plaintiff suggests that this court should exercise its discretion and decline to hear these declaratory relief claims, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a). *See id.* at 37–38.

> 1.    *Independent Basis for Justiciability*

"A counterclaim seeking a declaratory judgment may be dismissed if it is duplicative of the counterclaimants' affirmative defenses, does not broaden the scope of the dispute, or would not present a live controversy once the plaintiffs' claims have been resolved on the merits."  *Grey Wall Software, LLC v. AeroSimple LLC*, No. 3:22-cv-203(RAR), 2023 WL 5802621, at *4 (D. Conn. Sept. 7, 2023).   Specifically, as to counterclaims which may be duplicative of affirmative defenses, "[w]hen a counterclaim is merely the 'mirror image' of an opposing party's claim and the counterclaim serves no

independent purpose, the counterclaim may be dismissed." *Allstate Ins. Co. v. Martinez*, No. 3:11cv574(VLB), 2012 WL 1379666, at *4 (D. Conn. Apr. 20, 2012) (citing to a series of cases supporting the proposition).

Dismissal under the "mirror image" doctrine may be granted pursuant to Federal Rule of Civil Procedure 12(f), which states that "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." While Plaintiffs do not explicitly cite to Rule 12(f), the Rule itself allows the court to strike a pleading "on its own." Fed. R. Civ. P. 12(f). "The motion to strike standard is the 'mirror image' of the standard for a 12(b)(6) motion to dismiss for failure to state a claim." *Bilyard v. Am. Bankers Ins. Co. of Fla.*, No. 3:20cv1059(JBA), 2021 WL 4291173, at *6 (D. Conn. Sept. 21, 2021) (citing to *Sony Fin. Servs., LLC v. Multi Video Grp. Ltd.*, No. 03Civ.1730(LAK)(GWG), 2003 WL 22928602, at *8 (S.D.N.Y. Dec. 12, 2003)).

Under this standard, the court strikes all five of Defendants' pleadings for declaratory relief. In each of their declaratory relief claims, Defendants seek judgments of non-infringement, non-violation, or some variation thereof. *See* FAAC 58–63. But for few outliers, overwhelming majority of the allegation in support thereof simply state that Defendants is not guilty or liable for violating the statutory authority. While Defendants state that what they seek is a judgment declaring that Plaintiffs do not "possess any valid and enforceable rights in or to the [trademarks]," FAAC 65, such relief claimed is not sufficiently pled, especially when compared to prayers for declaratory relief. *See* Fed. R. Civ. P. 8(a). With much of the allegations dedicated to Plaintiffs' allegedly anticompetitive conduct, *see, e.g.*, FAAC 23, 27–28, 63, there are only few relevant allegations pertaining to the validity of Plaintiffs' trademark. Under the 12(b)(6) standard, the court finds that

this claim challenging the validity of BBAM's trademark, even when taken within the context of the entire complaint, amounts to "mere conclusory statements."  *Ashcroft*, 556 U.S. at 663.

Indeed, one particular paragraph in the complaint states "[t]o address BBAM's anticompetitive conduct, the Burnham Sterling Group now brings counterclaims against BBAM for (1) declaratory judgment that Burnham Sterling Group *did not engage in trademark infringement, unfair competition, or false advertising* and (2) violations of the California Unfair Competition law."   FAAC 28.   This paragraph supports Plaintiffs' argument that Defendants' counterclaims seek nothing more than a declaratory judgment of non-violation or non-infringement.  The court finds that Defendants' counterclaims are "subsumed by" Plaintiffs' claims and must be dismissed.  *Allstate Ins. Co.*, 2012 WL 1379666, at *4.

Given the main thrust of Defendants' counterclaims, the court finds that any arguments against the validity of Plaintiffs' trademark have been raised only in passing. To that end, Defendants' counterclaims seeking declaratory relief are denied with prejudice and may not be raised again at this time.

## V.   <u>CONCLUSION</u>

Accordingly, it is thereupon **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' motion to dismiss Defendants' Counterclaims is GRANTED:

    a. Defendants' UCL counterclaim is dismissed without prejudice, subject to any amended complaint filed by April 25, 2024, which establishes that relevant federal and state laws govern Plaintiffs' Japanese Lease transactions.

    **b.** Defendants' counterclaims seeking declaratory relief hereby are dismissed with prejudice.

2. Because Defendants' first amended counterclaim, ECF No. 118, has superseded their initial answer and counterclaim, ECF No. 95, Plaintiffs' motion to dismiss Defendants' counterclaims, ECF No. 139, and the related motion for judicial notice, ECF No. 140, are denied as moot.

**IT IS SO ORDERED** in Hartford, Connecticut, this 25th day of March, 2024.

_____/s/_____
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE